UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, CR. NO. 26-20634

v. Hon. Denise Page Hood

MOHAMD SALIM ABDESSAMED,

Defendant.

---

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT FOR LOSS OF EVIDENCE IN VIOLATION OF THE FIFTH AMENDMENT AND FED. R. CRIM. P. 16**

---

Mohamd Salim Abdessamed, through counsel Amanda Bashi and Daniel Dena, moves to dismiss the indictment with prejudice because the government allowed the vehicles at the center of its case to be lost. In support of this motion, Mr. Abdessamed provides the following:

1. Mr. Abdessamed is charged in a one-count indictment with assaulting, resisting, or impeding three ICE deportation officers—J.B., A.R., and J.M.—with a dangerous weapon, and with inflicting bodily injury on A.R., in violation of 18 U.S.C. § 111(a)(1) and (b). (ECF No. 20, PageID.38.) The government's theory, set out in its complaint, is that on June 4, 2026, he struck three government vehicles with his Chevrolet Malibu. (ECF No. 1, PageID.26–27.)

2. Mr. Abdessamed's account is that ICE officers in unmarked cars boxed him in and hit his car first. The damage to each vehicle, and the crash data stored in the Malibu's airbag module, are the objective evidence that can show who is right.

3. That evidence has been lost. On October 7, 2026, days after the defense asked for the vehicles' records, the government disclosed that the vehicle driven by J.B. "was surplussed." The same day, it said the Malibu was "not in the custody or control of the government or the prosecution team." A defense investigator then learned that the Detroit Police Department (DPD) sold the Malibu at auction on August 4, 2026, while the complaint was under seal and Mr. Abdessamed had no criminal counsel to seek preservation of the evidence in anticipation of impending criminal proceedings.

4. The government knew these vehicles mattered. On the day of the crash, ICE was already consulting the U.S. Attorney's Office about a § 111 prosecution. On June 9, 2026, Mr. Abdessamed asked a federal court, in his habeas case, to order the government to preserve "evidence concerning the vehicle incident." (Hab. ECF 1, PageID.2.) Exhibits in support of his petition included his declaration affirming that he had been hit by officers first, putting the Government on notice of Abdessamed's account. (Hab. ECF 13, attachment 13-4.) On June 15 and June 18, the U.S. Attorney's Office told that court there was no evidence that any officer made contact with him or his car after the initial encounter. (Hab. ECF 9, Resp. to Pet., PageID.170; Hab. ECF 20 (transcript), PageID.404

(tr. 23:3–7, 20–23)). By June 15, the government had its arrest warrant and complaint. Yet, the vehicles were not preserved.

5. DPD processed the scene alongside ICE, placed the Malibu on an evidence hold and, according to ICE's own arrest record, "impounded" it as part of the arrest. DPD acted as part of the investigatory arm of the prosecution, and the government's duty to preserve the evidence extended to the Malibu.

6. The loss of this evidence violates the Due Process Clause of the Fifth Amendment, *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), and Fed. R. Crim. P. 16(a)(1)(E). The only remedy that cures the prejudice is dismissal of the indictment with prejudice.

7. The facts that bear on the government's good faith—when and why J.B.'s vehicle was surplussed, and who released DPD's evidence hold on the Malibu—are in the government's hands. Mr. Abdessamed asks the Court to order the government to file records on those questions and to hold an evidentiary hearing.

8. Further, at an October 14, 2026 viewing of the other two vehicles (the two that have not been destroyed/lost), the defense learned that those vehicles remain in service, despite confirmed paint and clear coat damage. Their continued use amounts to spoliation of evidence.

9. And although the government has contended throughout proceedings in this case (and the related habeas case) that all of the ICE vehicles had their lights

and sirens activated, the defense learned that one of the vehicles has been serviced just recently to *install* lights and sirens that weren't there on June 4.

10. The government has produced very limited discovery. Mr. Abdessamed files this motion promptly after learning that the evidence is gone, and he reserves the right to supplement it after further discovery disclosures. To the extent any pretrial-motion deadline applies, good cause exists under Fed. R. Crim. P. 12(c)(3).

11. The facts and law in support of this motion are further detailed in the accompanying brief.

12. Counsel sought the government's concurrence per local rule, but did not receive it. *See* L.R. 7.1.

Dated: October 18, 2026

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**
s/ Amanda Bashi & Daniel Dena
Attorneys for Mohamd Abdessamed
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, CR. NO. 26-20634

v. Hon. Denise Page Hood

MOHAMD SALIM ABDESSAMED,

Defendant.

---

**BRIEF IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT
FOR LOSS OF EVIDENCE IN VIOLATION OF THE
FIFTH AMENDMENT AND FED. R. CRIM. P. 16**

---

## BACKGROUND

This is a case about who hit whom first. The government says that on June 4, 2026, Mohamd Abdessamed used his Chevrolet Malibu as a deadly weapon to intentionally hit three unmarked ICE vehicles. Mr. Abdessamed has said from the beginning that ICE officers boxed him in, that the car behind him rammed his bumper, and that he panicked and drove away from men he did not know were police.[1] The only objective way to decide between those accounts is the vehicles themselves: the damage on each government vehicle, the damage on the Malibu, and the crash data in the vehicles' airbag modules.

---

[1] "Crim. ECF" refers to this case, No. 2:26-cr-20634. "Hab. ECF" refers to *Abdessamed v. Raycraft*, No. 2:26-cv-11926 (E.D. Mich.), cited by PageID.

Neither the Malibu nor the vehicle driven by Deportation Officer J.B. exists as it did on June 4. The government has "surplussed" J.B.'s vehicle. The Detroit Police Department (DPD), which processed the scene alongside ICE and put the Malibu on an evidence hold, sold the Malibu at auction on August 4, 2026, while the instant criminal complaint was sealed and the man it charged was recovering from surgery without a criminal lawyer. Within an hour of the prosecutor writing that the Malibu "remains" in DPD's custody, a defense investigator learned that DPD had sold it two months earlier. Nothing the government has disclosed suggests that anyone took a single step to preserve either vehicle.

## I. The June 4 stop: three unmarked cars, one Malibu, and a fence pole on Warwick Street.

On the morning of June 4, ICE Enforcement and Removal Operations (ERO) officers surveilled a house on Tireman Avenue in Detroit looking for Mr. Abdessamed, a 23-year-old Mauritanian asylum applicant whose removal case was open and whose address was on file with the Department of Homeland Security. (Hab. ECF 18, PageID.374-75 (ICE "knew exactly where he lived").) When Mr. Abdessamed got into his Malibu on Minock Street, the government says, four government vehicles stopped him with lights and sirens activated. He failed to yield and struck the front left bumper of "Victim 1's" vehicle, then the driver's door of "Victim 2's" vehicle as the officer was exiting, then the front passenger side of "Victim 3's" vehicle. (Crim. ECF 1, PageID.26–27.) He lost control at Whitlock and Warwick, went through a fence and a garage, and

came to rest on two parked cars with a fence pole through his chest. (*Id.* at PageID.27; Ex. C at 34.) The indictment charges him with assaulting three deportation officers—J.B., A.R., and J.M.—with a dangerous weapon, and with inflicting bodily injury on A.R. (Crim. ECF 20, PageID.38.)

Mr. Abdessamed's account, in a declaration he signed twelve days after the crash and filed in his habeas case, is different. He was "boxed in by three cars that had no markings." (Hab. ECF 13-4 ¶ 7, PageID.284.) He "didn't know who they were." (*Id.*) Then "the car behind me bumped my back bumper hitting it." (*Id.*) There were no lights, sirens, or markings. (*Id.* ¶ 8; *see id.* ¶ 11.)

Other evidence points the same way. April King's home camera recorded the sound of a collision just before Mr. Abdessamed lost control, and Ms. King told WXYZ that ICE "chased that man through this neighborhood. They hit his car and caused him to lose control." (Hab. ECF 1-6, PageID.38, 46.) At 10:28 a.m., a caller told the 911 dispatcher: "ICE AGENTS IN VEHS CHASING SOMEONE AND THE VEH BEING CHASED WENT AIR BORN AND FLEW INTO HIS HOME." (Ex. C at 1.)

The government's own accounts do not agree with each other. ICE's team lead, Todd Ankenbauer, told DPD at the scene that the officers "had lost sight of the Malibu," "canvassed the area," and that Officer James Baber located it at Warwick. (Ex. C at 34.) The complaint says four government vehicles made the stop; Ankenbauer told a DPD sergeant that three did. (*Compare* Crim. ECF 1, PageID.26–27, *with* Ex. C at 26.)

And when Mr. Abdessamed challenged his ICE detention in federal court, the U.S. Attorney's Office told Judge Grey that a neighbor's video showed "a single immigration official following him . . . approximately 4 seconds later," that "[o]nly one officer followed him until he crashed," and that "there is no evidence that any officer made contact with petitioner or his vehicle again until after he crashed." (Hab. ECF 9, PageID.153, 170; Hab. ECF 20, PageID.404.) The government maintained this position despite video evidence to the contrary.

## II. DPD works the scene with ICE and places the Malibu on an evidence hold.

DPD officers were on scene talking with the ICE agents by 10:30 a.m. (Ex. C at 1, 34.) Officer Tyler Watson's report relays Ankenbauer's account of the stop, classifies the incident as "Aggravated / Felonious Assault," and lists ICE officers Ankenbauer and A.R. among the victims. (*Id.* at 28, 34.) DPD's Fatal Squad ordered evidence technicians to "process scene, photos and collection of evidence" (*id.* at 21), and DPD's property log lists "RECORDINGS/AUDIO-VISUAL" and a "3d scan project" (*id.* at 33). The Malibu was towed to DPD's Mount Elliott lot and "placed onto evidence #3921701." (*Id.* at 34.) DPD's crash report adopts ICE's version: the driver "was attempting to flee from ICE Agents and intentionally struck 3 motor vehicles." (*Id.* at 37.)

ICE's paperwork shows the same alignment. Its arrest record states that "HSI and ERO Detroit's Task Force Officer have been in contact with the United States

Attorney's Office for the Eastern District of Michigan regarding possible federal charges for 18 U.S.C. § 111 while the Detroit Police Department conducts a traffic investigation." Under "Property," it records: "DPD seized his two phone and impounded his car." (Ex. D at 2, 4.) By the afternoon of June 4, ICE had a § 111 prosecution in view, and it logged DPD's impoundment of the Malibu as part of its own arrest.

**III. ICE's written policies for preserving evidence.**

Under the Department of Homeland Security ("DHS") policy, the vehicles involved in the June 4, 2026 incident were the kind of evidence DHS and ICE agents routinely identify, document, and preserve. The Homeland Security Investigations ("HSI") Evidence Handbook defines evidence as "tangible and intangible items that help to prove or disprove the existence of an alleged fact." (Ex. E, Evidence Handbook, HSI HB 15-05, ch. 2, at 1) It expressly includes items "seized or collected by HSI SAs, U.S. Customs and Border Protection (CBP) officers, and/or other law enforcement officers during the course of an incident," and states that "[t]here are strict protocols and procedures for maintaining and using seized items . . . during an investigation." (*Id.*) HSI trains its agents that "Evidence includes Instrumentalities and Fruits," and that recognized evidence types include trace, tool-mark, and impression evidence. (Ex. F, HSI Special Agent Training: Evidence Processing, slides 23, 39).

Noting that HSI agents increasingly investigate "acts of violence, including assaults," the Evidence Handbook deems it "imperative" that agents partner with

federal, state, and local agencies "in order to ensure the preservation and potential use of the evidence." (Ex. E, Evidence Handbook §§ 9.13 at 37). The purpose of that partnering, according to HSI's training, "is to ensure proper collection and preservation of evidence for use as evidence in a prosecution." (Ex. G, *Evidence Processing Student Guide* at 39). "Items that are seized with the expectation that they will be used as evidence must be documented" in the agency's seizure-tracking system and on a DHS Form 6051S chain-of-custody receipt. (Ex. E, Evidence Handbook ch. 6, at 13; *id.* chs. 10–11, at 38–39.) Agents are trained that, for evidence to be admitted, they must be able to testify that the item presented at trial is "in substantially the same condition" as when first discovered. (Ex. G, Student Guide at 6) Policy further mandates that "[a]ll seized property/evidentiary items must be retained until the completion of all trial, appellate, or other judicial proceedings," and that agents "[w]ork with AUSA or State/Local Prosecutor to ensure all evidentiary items needed for trial are available." (Ex. E, Evidence Handbook ch. 13, at 48; Ex. G, Student Guide at 60).

## IV. The government is told, in writing and in open court, that the vehicles matter.

Over the next five weeks, the government learned that its account of the collision would be directly contested and that the physical evidence would matter. On June 5, WXYZ published the eyewitness account that ICE hit Mr. Abdessamed's car. (Hab. ECF 1-6, PageID.38.) On June 9, Mr. Abdessamed's habeas petition asked the Court to order the government "to preserve evidence concerning the vehicle incident and

resulting injuries" and sought "preservation of all law-enforcement and medical evidence concerning the incident." (Hab. ECF 1, PageID.2, 10.) The U.S. Attorney's Office for this District—the office that now prosecutes this case—represents the government in that habeas case. On June 15 it filed a response arguing about contact between the vehicles, relying on the neighbor's video and the officers' memoranda of investigation. (Hab. ECF 9, PageID.153, 170.) That same day, Special Agent Dawn Ohanian swore out the sealed complaint charging Mr. Abdessamed with the collisions with three government vehicles. (Crim. ECF 1, PageID.26–27.)

On June 18, habeas counsel urged the court to keep a temporary restraining order in place "[b]ecause of the preservation of evidence," warning that "we may lose the preservation of evidence that we need for the underlying Fifth and Fourth Amendment claims." (Hab. ECF 20, PageID.388–89.) The government answered that the officers had written memoranda of investigation, and that "after he fled there was no use of force." (*Id.* at PageID.403–04.) On July 6, it told the court it had "a photo of the damage of one of the ICE vehicles." (Hab. ECF 21, PageID.455.)

### V. While the criminal case is sealed, the Malibu is sold at auction and J.B.'s vehicle is surplussed.

Mr. Abdessamed spent days in intensive care and had surgeries on his head, face, and shoulder. (Hab. ECF 13-4 ¶ 14, PageID.285–86.) He was discharged on June 18 on an order of supervision and reported to ICE as directed. (Hab. ECF 20, PageID.386, 396; Hab. ECF 21, PageID.437.) The complaint and warrant were under seal and

Abdessamed was provided no notice of the charge pending. At the July 6 habeas hearing his lawyer told the Court that "the criminal case continues to be sealed" and that "to our knowledge he has not received any formal notice of the arrest." (Hab. ECF 21, PageID.436.) The complaint was not unsealed until September 9, and no criminal lawyer was appointed until September 15. (Crim. ECF 8, 9, 11.)

A month prior to the unsealing, on August 4, DPD sold the Malibu at auction at its Grand River lot, two months after placing it on evidence hold. (Ex. B.) The government has not said who released the hold, when, or why. On September 15, Mr. Abdessamed was arrested at one of his regular ICE check-ins—three months after the warrant issued and six weeks after the Malibu was sold. (Crim. ECF 19.) A magistrate judge appointed the Federal Community Defender and entered a *Brady* order that day. (Crim. ECF 11, 12.) A grand jury indicted him on September 23. (Crim. ECF 20.)

On October 5, undersigned counsel wrote to the prosecutor asking him to preserve, obtain and make available the evidence in the case, including the vehicles involved. On October 7, the government wrote that ICE could make vehicles available for inspection, but that "[t]he vehicle driven by J.B. is not available as it was surplussed, but there are photographs of it taken by DPD on the date of the assault." (Ex. A at 2.)

Asked about the Malibu, the prosecutor first wrote that it "is not (and never has been) in the custody of DHS or DOJ. It was taken into custody by DPD at the scene of the crash and, to my knowledge, remains in their custody." Eight minutes later he wrote that it "is not in the custody or control of the government or the prosecution

team. The owner of the malibu is your client." (Ex. A at 1.) At about 1:50 p.m., a DPD representative told a defense investigator that the Malibu had been sold at auction on August 4. (Ex. B.) The government has produced limited discovery to date. None of it addresses why the government would lose, destroy, or spoil key evidence in this case.

On October 14, 2026, defense counsel had an opportunity to review the two vehicles yet to be surplussed and learned that both vehicles had remained in operation and in the field for use by officers since June 4, 2026, and that both vehicles may have been serviced for maintenance in the meanwhile. Defense was informed that, at the least, the vehicle being driven by A.R. had since been altered by installing lights and sirens, which it did not have at the time of the incident. The government, a day later, provided receipt of the alterations, confirming no lights and sirens on A.R.'s vehicle before October 8, 2026. (Ex. H, Receipt for A.R.'s lights and sirens) Defense counsel does not know if the same ICE officers involved in this case have had continuous access to the vehicles since, given the vehicles have remained in operation.

## LEGAL STANDARD

Due process guarantees "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). When the government fails to preserve evidence, the remedy depends on the evidence. Evidence that is materially exculpatory—that "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"—must be

preserved, and its loss violates due process whether or not the government acted in bad faith. *Id.* at 488–89; *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). Evidence that is only "potentially useful"—material of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"—requires the defendant to show "bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

In this Circuit, a defendant must show "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996); *see also United States v. Wright*, 260 F.3d 568, 570–71 (6th Cir. 2001); *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002). The first two elements are inter-related: bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Jobson*, 102 F.3d at 218 (citing *Youngblood*, 488 U.S. at 56 n.*). A defendant shows bad faith with proof of "official animus" or a "conscious effort to suppress exculpatory evidence." *Id.* (quoting *Trombetta*, 467 U.S. at 488). Negligence, even gross negligence, is not enough. *Id.*; *Wright*, 260 F.3d at 571–72.

Courts applying this framework have dismissed indictments where the government, on notice that evidence mattered to the defense, let it be lost. *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977–82 (9th Cir. 2015) (surveillance video recorded

over after defense preservation request); *United States v. Cooper*, 983 F.2d 928, 931–33 (9th Cir. 1993) (laboratory equipment destroyed); *United States v. Bohl*, 25 F.3d 904 911-915 (10th Cir. 1994) (steel towers disposed of despite repeated requests). Most recently, a federal court dismissed a § 111 charge where HSI repaired its vehicle before the defense could inspect it. *United States v. Blandon-Saavedra*, No. 5:25-cr-00310-KK, Dkt. 64 at 6–10 (C.D. Cal. Nov. 14, 2025). The court observed that the case "joins at least two other recent cases in which physical evidence from a vehicle collision where the defendant is alleged to have assaulted ICE officers with a car after being boxed in was lost or otherwise destroyed." *Id.* at 10 n.8.

Rule 16 requires the government to permit inspection of tangible objects "within the government's possession, custody, or control" that are material to preparing the defense, that the government intends to use in its case-in-chief, or that were "obtained from or belong[] to the defendant." Fed. R. Crim. P. 16(a)(1)(E). A prosecutor has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Courts ask whether the other agency is "acting on the government's 'behalf' or is under its 'control,'" whether the agencies are "part of a 'team,'" "participating in a 'joint investigation'" or "sharing resources," and whether the prosecution has "'ready access' to the evidence." *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006); *see United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir. 1979); Justice Manual § 9-5.002 ("Members of

the prosecution team include federal, state, and local law enforcement officers" and "other government officials participating in the investigation and prosecution.").

## ARGUMENT

The government cannot charge Mr. Abdessamed with using a car as a weapon against three officers and then let the cars disappear. Both vehicles were within the government's duty to preserve. Both had exculpatory value that the government knew about. No substitute exists. And the government's inaction after notice was bad faith. The indictment should be dismissed with prejudice.

### I. The Malibu was within the prosecution team's control, so the government's duty to preserve extended to it.

The government's answer on the Malibu is that it was DPD's car and that "[t]he owner of the malibu is your client." (Ex. A at 1.) Neither point matters. The question is whether the prosecution team had control of the car, not whose name was on the title or whose lot it sat on. *Youngblood* itself asks about bad faith "on the part of the police," 488 U.S. at 58; it does not separate the prosecutor from the officers who gather and hold evidence for the prosecution. And on this record DPD acted as a member of the team.

*First*, ICE and DPD worked the scene together and from the same account. DPD arrived within minutes, spoke with the ICE agents, and wrote a report that repeats Ankenbauer's version, classifies the incident as felonious assault with ICE officers as victims, and adopts ICE's conclusion that Mr. Abdessamed "intentionally struck 3

motor vehicles." (Ex. C at 1, 28, 34, 37.) DPD's evidence technicians processed the scene and logged "RECORDINGS/AUDIO-VISUAL" and a "3d scan project." (*Id.* at 21, 33.)

*Second*, ICE treated DPD's impoundment of the Malibu as part of its own arrest. Its arrest record lists, under "Property," that "DPD seized his two phone and impounded his car," in the same document that says ICE and HSI were already consulting the U.S. Attorney's Office about a § 111 prosecution "while the Detroit Police Department conducts a traffic investigation." (Ex. D at 2, 4.) This was not the tow of an abandoned car. It was DPD placing a car on an evidence hold in an assault investigation of federal officers, while federal prosecutors were being consulted.

*Third*, the prosecution treats DPD's evidence as its own. When it disclosed that J.B.'s vehicle had been surplussed, it offered in its place "photographs of it taken by DPD." (Ex. A at 2.) The government cannot offer DPD's photographs as a substitute for a lost vehicle while denying that DPD's evidence is within its reach. Nor was access difficult. The prosecutor knew DPD took the Malibu "at the scene of the crash" and says he believed on October 7 that it "remains in their custody." (*Id.* at 1.) A defense investigator confirmed with one phone call that it had been sold. (Ex. B.) A call from the prosecutor, or from the ICE agents who were in contact with DPD from the day of the crash, asking DPD to hold the car would have preserved it. *Cf. Risha*, 445 F.3d at 304 ("ready access").

Under *Kyles*, *Risha*, and *Antone*, these facts make DPD part of the prosecution team as to the Malibu. The Sixth Circuit has likewise analyzed the loss of DPD-held evidence in a federal prosecution as the government's failure to preserve, without suggesting that DPD's custody put the evidence beyond the government's duty. In *Jobson*, a federal felon-in-possession case, the lost item was a DPD radio-dispatch tape erased under DPD policy, and the court asked whether anyone at DPD or the U.S. Attorney's Office suspected the tape was exculpatory. 102 F.3d at 218. The Court analyzed the issue by treating DPD's destruction of evidence as government conduct and applying the *Trombetta* and *Youngblood* test without questioning whether DPD was part of the prosecution team. *Id.* at 218-219. To the extent that the fact was assumed because it was not challenged by the government, the Court's footnote admonishment of the government for not knowing the routine evidence-destruction procedures, "whether local or federal," signals that the U.S. Attorney's Office is ultimately answerable for a local department's retention practices. *Id.* at fn. 2.

The Malibu was also an item that "belong[ed] to the defendant," Fed. R. Crim. P. 16(a)(1)(E)(iii), so the government's point that Mr. Abdessamed owned it is the very reason the rule applies. And the government does not shed control of an item by handing it to a third party. *Cf. Blandon-Saavedra*, Dkt. 64 at 11 n.9 (argument that vehicle left government control when sent to repair shop "contravenes common sense"). Nor could Mr. Abdessamed have protected the car himself. It was on a police evidence hold, he was in a hospital guarded by ICE agents (Hab. ECF 13-4 ¶ 14, PageID.286), and he

was then released into a sealed case without a criminal lawyer or notice that he was charged.

## II. Both vehicles had exculpatory value that the government knew about before they were lost.

Section 111 requires that the defendant act "forcibly," and an assault under the statute requires intent. *United States v. Feola*, 420 U.S. 671, 684 (1975). If ICE's vehicles struck the Malibu first and boxed it in, the government's theory that Mr. Abdessamed used his car to attack officers fails: he did not intend to assault anyone, and his driving was a response to force rather than the use of it. *See United States v. Span*, 970 F.2d 573, 577 (9th Cir. 1992) (excessive-force defense to § 111); *Blandon-Saavedra*, Dkt. 64 at 7 (same).

The vehicles are the best evidence on that question. The damage to J.B.'s vehicle, and to the other ICE vehicles, shows whether, where, and at what angle each was struck by the Malibu or struck it. Damage to the Malibu's rear bumper shows whether it was hit from behind before it moved, as Mr. Abdessamed says. The Malibu's airbag control module records pre-crash speed, braking, and steering, which bear directly on the complaint's claim that he sped away and rammed officers. (Ex. I ¶¶ 17, 30.) All of that is lost. And because reconstruction depends on matching damage between vehicles—paint transfer, heights, crush profiles—the loss of either car limits what an expert can say even about the cars that remain. (*Id.* ¶¶ 37, 38.)

The government knew all of this before the vehicles were lost. Its own complaint rests on three collisions. ICE had a § 111 prosecution in view by the afternoon of June 4. (Ex. D at 2.) An eyewitness said publicly on June 5 that ICE "hit [Abdessamed's] car." (Hab. ECF 1-6, PageID.46.) On June 9, the defense asked a federal court to order preservation of "evidence concerning the vehicle incident." (Hab. ECF 1, PageID.2.) On June 15 and 18, the U.S. Attorney's Office argued the contact question to that court, and on July 6 it relied on "a photo of the damage of one of the ICE vehicles." (Hab. ECF 9, PageID.153, 170; Hab. ECF 20, PageID.403–04; Hab. ECF 21, PageID.455.) A party that relies on a photograph of damage to prove its account knows the damage and the vehicle is evidence.

That the vehicles might have supported the government's account rather than Mr. Abdessamed's does not change the analysis. Defendants "should not be made to suffer because government agents discounted their version." *Cooper*, 983 F.2d at 933; *see Zaragoza-Moreira*, 780 F.3d at 979 (agent's knowledge of defense claim controls regardless of the "strength of [the] defense and whether [the agent] believed the claim"). Because the exculpatory value of the vehicles was apparent and no comparable evidence exists, they were materially exculpatory, and their loss violates due process without regard to bad faith. *Trombetta*, 467 U.S. at 488–89; *Fisher*, 540 U.S. at 547. If the Court views them as only potentially useful, bad faith is shown below.

## III. Mr. Abdessamed cannot obtain comparable evidence.

The government will point to photographs. DPD photographed J.B.'s vehicle, ICE has a photograph of the damaged vehicle(s), and DPD's Fatal Squad photographed the scene. Few have been produced, and none are a substitute. Photographs "cannot capture three-dimensional deformation, crush depth, transfer marks, or other impact-related characteristics." *Blandon-Saavedra*, Dkt. 64 at 9–10; *see Sivilla*, 714 F.3d at 1174 (photographs not comparable where defense expert "would have needed access to the vehicle itself"); *Cooper*, 983 F.2d at 932. (Ex. I ¶¶ 37-40.) Photographs taken by the officers who were parties to the collision, from angles they chose, are the opposite of the independent examination the defense needs. No photograph records the airbag module's data. And the Malibu itself is gone; its buyer is unknown.

The vehicles that remain do not cure the loss. Each is only one half of a collision, and sequence is determined by matching one vehicle's damage to the other's. (Ex. I ¶ 37-39.) Worse yet, both of the remaining vehicles are still in active service and use, despite confirmed paint and clear-coat damage. Continued use increases the risk of contamination and degradation of the damaged areas, further compromising the ability to conduct an accurate collision analysis.

## IV. The government acted in bad faith.

Bad faith turns on what the government knew about the evidence's value when it was lost, *Jobson*, 102 F.3d at 218, and on whether the loss reflects "official animus" or a "conscious effort to suppress exculpatory evidence," *id.* The record shows both.

### A. The government knew the vehicles' value.

As shown above, the government knew from June 4 that it was considering pursuing a § 111 charge. Meanwhile, an eyewitness said publicly on June 5 that it was ICE who hit Mr. Abdessamed's car. Video and audio captured support this eyewitness account. On June 9, Abdessamed's habeas petition asked the Court to order preservation of evidence of the vehicle incident. On June 15 and June 18 the government itself argued the contact question to that court, and on June 18 habeas counsel warned in open court that evidence needed for the underlying Fourth and Fifth Amendment claims could be lost. The prosecution's knowledge of the evidence's value is not in doubt.

### B. After notice, the government's choices left both vehicles unprotected.

A prosecution team that knows evidence matters, is asked to preserve it, and does nothing is not merely negligent. In *Zaragoza-Moreira*, the Ninth Circuit found bad faith where agents knew of the defense claim and did not preserve video. 780 F.3d at 979–80. In *Bohl*, disposing of evidence "in the face of the defendants' repeated requests for preservation," with no "innocent explanation offered by the government," supported "a logical conclusion of bad faith." 25 F.3d at 913. And in *Blandon-Saavedra*, the court found bad faith where the agency pressed ahead with quick repairs after learning of the defense claim. Dkt. 64 at 8–9.

*First*, the government chose to litigate contact between the vehicles on video and testimony while the vehicles went unprotected. On June 15, it told a federal judge that there was no evidence any officer made contact with Mr. Abdessamed or his car after the initial encounter, relying on officers' memoranda. (Hab. ECF 9, PageID.153, 170.) Nothing produced or disclosed shows that anyone in the government, ICE, or DPD asked that either vehicle be held.

*Second*, the government's timing left no one to ask. The complaint was sealed on June 15 and remained sealed until September 9. (Crim. ECF 3, 4, 8, 9.) During that period Mr. Abdessamed—whose address ICE already had, and who was reporting to ICE as ordered—was not arrested, was not told he was charged, and had no criminal lawyer to demand preservation. In *Zaragoza-Moreira*, *Bohl*, and *Blandon-Saavedra*, the defense sent preservation demands that went unheeded. Here the government's own course meant that no one was in a position to send one until months later. The Court need not find the timing was designed to produce this result. It is enough that the government, knowing the evidence mattered, chose a course that left two vehicles with no protector but itself, and then did nothing.

*Third*, the government surplussed the vehicle driven by one of the three officers the indictment names as victims. It did so at some point after June 4—after ICE had already begun consulting the U.S. Attorney's Office about charges and after a witness alleged that ICE had struck Abdessamed, causing him to crash—and disclosed that fact only after the defense asked to view the vehicle and its records. It has not said when,

by whom, or why. Where evidence is disposed of after notice and the government offers no innocent explanation, the inference of bad faith is a logical one. *Bohl*, 25 F.3d at 913. The facts about the surplus are in the government's hands alone.

*Fourth*, the government's statements on October 7 show that no one on the prosecution team was tracking the Malibu. Four months after the crash, the prosecutor believed the Malibu "remains" in DPD's custody; eight minutes later he said it was outside the control of "the government or the prosecution team." (Ex. A at 1.) It had been sold for two months. A team that does not know where its principal exhibit is has made no effort to keep it. Notably, the Malibu is the "deadly weapon" the government seeks to prove Mr. Abdessamed used in this case.

### C. This was not a routine, good-faith loss.

The Sixth Circuit's cases finding no bad faith involved losses no one had reason to question. In *Jobson*, a tape was erased under routine policy and nothing indicated that anyone suspected it was exculpatory. 102 F.3d at 218. In *Wright*, fire investigators were at most negligent and there was no allegation of official animus. 260 F.3d at 571–72. Here the government was told in writing and in open court, argued the very point in dispute, and has identified no policy that required either the Malibu's sale or J.B.'s vehicle's surplus. Even if it had, "[a]dherence to standard policies and procedures does not disprove bad faith." *Blandon-Saavedra*, Dkt. 64 at 9 (citing *Cooper*, 983 F.2d at 930, and *Zaragoza-Moreira*, 780 F.3d at 980). Proceeding after notice for administrative

convenience "at best prioritized administrative expedience . . . over [the government's] constitutional duty to preserve exculpatory evidence." *Id.*

If anything is routine, it is the *preservation* of evidence—in this case, the deadly weapon identified in the indictment and the vehicle it purportedly hit—for the duration of a criminal investigation and prosecution. ICE officers, through training provided by HSI, are trained in identifying what evidence is, the strict manner by which they are to preserve it, and for how long. (Ex. E, F, G) In this case, the indictment alleges that Abdessamed used his vehicle as a deadly weapon. ECF No. 20. The refusal to preserve two of the vehicles involved (including the "weapon" itself), especially in light of the data retrievable from the physical evidence, defies both the written and longstanding training and policy, as well as common sense.

## V. Rule 16 confirms the duty the government failed to meet.

"[W]hen the government fails to comply with preservation requests and allows evidence to be destroyed, it likely runs afoul of its discovery disclosure requirements under [Rule 16]." *Zaragoza-Moreira*, 780 F.3d at 981. Rule 16 materiality is a "low threshold," *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013), and the vehicles in a case charging use of a vehicle as a weapon clear it easily. The defense's October 5 letter asked the government to "preserve" the evidence and to produce the vehicles' examination reports and service histories. (Ex. E at 1, 12–13.) The government's response was that one ICE vehicle had been surplussed and the other was the defendant's. A Rule 16 violation is not itself a due process violation absent bad

faith, *Zaragoza-Moreira*, 780 F.3d at 981, but bad faith is shown here, and Rule 16 authorizes "any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D). Dismissal is the just order.

## VI. Dismissal with prejudice is the only adequate remedy.

When the loss of evidence violates due process and no comparable evidence exists, the remedy is dismissal. *Cooper*, 983 F.2d at 932–33 (affirming dismissal); *Zaragoza-Moreira*, 780 F.3d at 982 (directing dismissal); *Bohl*, 25 F.3d at 914 (same); *Blandon-Saavedra*, Dkt. 64 at 10 (dismissing count with prejudice). The government's case is that Mr. Abdessamed rammed three officers. The proof of that, and of the defense, was in the cars. Without them, a trial would pit the officers' recollections against a defendant who cannot show the jury what the vehicles looked like on June 4, while the government offers its photographs and the testimony of the very officers whose vehicles disappeared. No instruction can restore a rear bumper or an airbag data module.

This case is also stronger than *Blandon-Saavedra*, where the district court (1) ordered dismissal of one count because that vehicle had been repaired (not surplussed or destroyed), and (2) one intact ERO vehicle kept one count alive. Dkt. 64 at 10 n.11. Here, the Malibu was the one common element of every collision the indictment charges, and it is gone. So is the vehicle of one of the three named officers. A single count resting on three collisions, none of which can be examined, cannot be fairly tried,

and re-indictment would not bring the evidence back. Dismissal should be with prejudice.

### VII. The Court should require the government to account for the lost vehicles.

To the extent the Court believes any fact needed to rule on this motion is disputed, those facts are in the government's hands: when, why, and by whom J.B.'s vehicle was surplussed and what repairs preceded it; who released DPD's evidence hold on the Malibu and whether anyone on the prosecution team asked for, knew of, or acquiesced in the release; and whether anyone asked that either vehicle be preserved. Mr. Abdessamed asks the Court to order the government to file records on those questions, as set out below, and to hold an evidentiary hearing at which the responsible agents testify.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the indictment with prejudice. Mr. Abdessamed further asks the Court to order the government, within seven days, to file: (1) records showing when, why, and on whose authority J.B.'s vehicle was surplussed, including its repair and service history, fleet and accident records (including SF-91 and SF-94 forms and any Report of Survey), photographs, and any telematics or event data; (2) all communications among ICE, HSI, the U.S. Attorney's Office, and DPD concerning the Malibu, DPD evidence hold #3921701, its release,

and the August 4 sale; and (3) any request by anyone on the prosecution team that either vehicle be preserved; and to set an evidentiary hearing.

Dated: October 18, 2026

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Amanda Bashi & Daniel Dena
Attorneys for Mohamd Abdessamed
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system that will send notification of such filing to all registered parties.

/s/ Amanda Bashi
Attorney

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Emails between defense counsel and the government re: the vehicles (Oct. 7, 2026) |
| Exhibit B | Email from Richard Boyd, Investigator, re: the August 4, 2026 auction of the Malibu (Oct. 7, 2026) |
| Exhibit C | Detroit Police Department Records |
| Exhibit D | ICE EARM Encounter Summary and I-213 narrative |
| Exhibit E | HSI Evidence Handbook |
| Exhibit F | HSI Evidence Processing Powerpoint |
| Exhibit G | HSI Evidence Processing Student Guide |
| Exhibit H | Receipt for A.R.'s lights and sirens |
| Exhibit I | Declaration of Timothy Brown |